**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| In re: <br><br> Western United Nurseries, Inc., an Arizona corporation, <br><br> Debtor. <br>_____ <br> In re: <br><br> Western Group Nurseries, Inc., an Arizona corporation, <br><br> Debtor. <br>_____ <br> This Order Relates Only To MC 96-82: <br><br> Western Group Nurseries, Inc., an Arizona corporation, <br><br> Plaintiff, <br><br> vs. <br><br> Charles L. Leemon, <br><br> Defendant. <br>_____ | No. MC 96-0081-PHX-SMM <br> No. MC 96-0082-PHX-PGR (consolidated) <br> No. MC 96-0083-PHX-SMM (consolidated) <br><br> Br. No. 92-3004-PHX-GBN <br> Br. No. 92-3005-PHX-RGM <br> (jointly administered under 92-3004) <br><br> Adv. No. 94-126 <br> Adv. No. 94-185 <br> Adv. No. 94-813 <br><br> **MEMORANDUM OF DECISION AND ORDER** |

On July 3, 2000, the Court issued an Order resolving these consolidated matters. Pending before the Court at that time were Proposed Findings of Fact and Conclusions of Law issued by the bankruptcy court in three adversary proceedings, and accompanying

Objections from the parties. The Court concluded that Western Group Nurseries, Inc.'s ("Western") claims were barred by the statute of limitations.

Western then filed a motion for reconsideration, informing the Court that it had initiated suit against Defendant Charles L. Leemon ("Mr. Leemon") before suing the other Defendants. The Court therefore granted Western's motion for reconsideration as to Mr. Leemon. Consequently, the bankruptcy court's Proposed Findings of Fact and Conclusions of Law in Adversary Number 94-813, and the parties' Objections thereto, are again before the Court.

## BACKGROUND[1]

The matters pending before the Court constitute only a few chapters in a saga of litigation that has spanned over twenty years, involved at least a dozen courts, implicated the laws of multiple states, and disrupted the lives and businesses of innumerable parties. Fortunately, while the parties disagree sharply on the meaning and legal consequences of their actions, the essential factual background is not in dispute.[2]

**A.     The Participants**

**1.     The Sellers**

In 1984, Sonora Nursery was the largest plant nursery business in the southwestern United States. Sonora Nursery was actually the trade name for a group of nurseries owned by a series of limited partnerships. Joseph Tyler, a Phoenix horticulturist, managed the day-to-day operations of the nurseries. Mr. Tyrone Kindor, a Phoenix businessman, served as a business consultant and structured the limited partnerships as tax-favored investments. Western United Nurseries, Inc. was the general and managing partner of the limited

---

[1] Most of the background included here was set forth in the Court's Order of July 3, 2000. It is repeated here for clarity.

[2] The background set forth here comes from a variety of sources, including the pleadings filed by the parties in this Court and in the bankruptcy court, the accompanying exhibits, and the opinions of other courts which have addressed the same transactions. Primarily, however, this description comes from those facts set forth by the bankruptcy court in its proposed findings of fact to which the parties have not filed Objections.

- 2 -

partnerships. Sometime in 1984, Tyler and Kindor decided to sell the nursery operations. Collectively, the Court will refer to Tyler, Kindor, Western United Nurseries, Inc., and the original limited partnerships and their members as the "Sellers."

### 2. World Nurseries, Inc.

In late 1984, Kindor began to negotiate with World Nurseries, Inc. ("World") for the sale of Sonora Nursery. World was a Delaware corporation that specialized in creating limited partnerships to serve as tax-favored investments, or tax shelters. World offered to purchase the Sonora Nursery, and planned to immediately resell the nurseries to a limited partnership.

### 3. The Limited Partnership and the Limited Partners

World created Arizona World Nurseries Limited Partnership, ("the Limited Partnership"), an Arizona limited partnership, to be the ultimate owner of the nurseries. World resold the nurseries to the Limited Partnership immediately after World purchased the nurseries from the Sellers. The Limited Partnership consisted of a general partner and approximately two hundred limited partners ("the Limited Partners"), including Charles Leemon ("Leemon"). The general partner, Mr. Harvey Minars, marketed the Limited Partnership to investors in 85 units, which investors could purchase for $100,000 per unit. Investors could also purchase fractional units. Upon purchasing a unit or a portion of a unit, an investor became a Limited Partner. All of the Defendants in this litigation were Limited Partners.

In order to purchase the nursery from World, the Limited Partnership had to provide World with a promissory note. The Confidential Private Offering Memorandum given to prospective investors stated, on its first page: "In addition, each Investor will be personally liable for a portion of the Partnership Note issued to World Nurseries in connection with the purchase of the Nursery Stock and Plant Materials equal to $260,000 per Unit." The Partnership Agreement likewise specified: "By subscribing to the Agreement each Limited Partner agrees to be personally liable for his pro rata share . . . of the Partnership Note equal to $260,000 per Unit." The same warning appeared again in the Subscription Agreements:

"The Subscriber understands that pursuant to the Partnership Agreement . . . he is agreeing to be personally liable for his proportionate share of the Partnership Note to World Nurseries Inc. ("World Nurseries") equal to $260,000 per Unit."

The Limited Partnership was formed pursuant to the laws of Arizona and registered in Arizona, and the Partnership Agreement is governed by Arizona law. The Subscription Agreement, however, contains a choice-of-law clause selecting New York law.

### 4. Western Group Nurseries

The Sellers retained a security interest in the nursery property even after World resold the property to the Limited Partnership. The Sellers also had a security interest in the promissory note given by the Limited Partnership to World as part of the Limited Partnership's purchase of the nursery ("the Partnership Note"). When World and the Limited Partnership defaulted on their obligations to the Sellers, the Sellers foreclosed on their collateral and obtained a special writ of execution ordering a sheriff's sale. The day before the sale, some or all of the Sellers created a new business, Western Group Nurseries, Inc. ("Western"). The original Sellers were the shareholders in Western, and they assigned a portion of the judgment against World to Western. At a sheriff's foreclosure sale, Sellers purchased the physical property of the Limited Partnership and Western, using their assigned portion of the judgment, purchased the Partnership Note. Western is the Plaintiff in this litigation, which is essentially a deficiency action against the Limited Partners.

## B. The Sales Transactions

### 1. The Sellers-World Sale

On December 11, 1984, Sellers and World entered into a Purchase Agreement for the sale of the nursery business to World. The actual sale took place on December 31, 1984. The Purchase Agreement set forth the general terms of the sale, and contained a choice-of-law clause. The choice-of-law clause stated: "This Agreement and the transactions contemplated herein have been consummated in the State of New York and shall be construed and enforced in accordance with and governed by the laws of such state, without regard to conflict of laws."

Sellers and World ultimately settled on a sales price of $22.1 million, with a $3 million cash payment at closing, an additional payment of $2.1 million due no earlier than January 1, 1986, and the balance covered by a $17 million cash flow promissory note. The promissory note was non-recourse, and did not contain a choice-of-law clause.

The parties also entered into a Security Agreement. The Security Agreement contained a choice-of-law provision similar to that in the Purchase Agreement: "This Security Agreement shall be governed by and interpreted under the laws of the State of New York applicable to contracts made therein, without giving effect to the principles thereof relating to the conflict of laws." The Security Agreement also recited World's intent to resell the nursery to a limited partnership for a cash payment and a "wraparound note." Then, the Security Agreement granted the Sellers:

> a purchase money security interest in and to the Properties and the Wraparound Note (*except that Secured Party shall not have the right to sue the Limited Partners or General Partners of the Partnership personally thereon other than to the extent of payments made to them by the partnership*) and the Partnership Security Agreements and all additions, attachments and replacements thereto and all proceeds therefrom (collectively, the "Collateral") and agrees that such security interest attaches upon the Closing of the Purchase Agreement.

(Emphasis added.) The parties sharply dispute the meaning and consequences of the Security Agreement's parenthetical limitation on the Sellers' right to sue the Limited Partners.

### 2. The World-Limited Partnership Sale

Immediately after taking title to the nursery from Sellers, World resold the business to the Limited Partnership. The Limited Partnership paid $6.7 million in cash and gave World a promissory note for $26.43 million ("the Partnership Note"). The Purchase Agreement between World and the Limited Partnership provided: "Each limited partner of the Purchaser shall be personally liable for his proportionate share of principal of the Note in the aggregate amount of $22,100,000." The Purchase Agreement also contained a choice-of-law clause: "This Agreement and the transactions contemplated herein have been consummated in the State of New York and shall be construed and enforced in accordance with and governed by the laws of such state, without regard to conflict of laws."

Also on December 31, 1984, the Limited Partnership executed the Partnership Note, entitled "Secure Recourse Note." The Partnership Note did not contain a choice-of-law clause, but did state: "This Note is issued pursuant to and is entitled to the benefits of a Purchase Agreement between Maker and Payee. . . [and] of a Security Agreement between Maker and Payee." The Partnership Note also contained a standard non-recourse clause. Immediately following the non-recourse clause, however, the Note provided: "Notwithstanding the foregoing, or any other provision of this Note to the contrary, each limited partner of the Maker shall be personally liable to the extent of $260,000 per unit of Limited Partnership interest for the principal hereon."[3]

Along with the Purchase Agreement and the Partnership Note, World and the Limited Partnership also entered a Security Agreement. The Security Agreement, like the Purchase Agreement, contained a choice-of-law clause adopting New York law: "This Agreement shall be governed by and interpreted under the laws of the State of New York applicable to contracts made and to be performed therein, without giving effect to the principles thereof relating to the conflict of laws."

Finally, immediately after receiving the Partnership Note from the Limited Partnership, World assigned or pledged that Note to Sellers. In an Assignment of Partnership Security Agreement and Wraparound Note, dated December 31, 1984, World did "hereby sell, assign and transfer" to Sellers "all Assignor's right, title and interest in and to (but none of its obligations under) a certain partnership security agreement dated December 31, 1984

---

[3]The tax laws of the early 1980's help explain the odd mix of recourse, limited recourse, and non-recourse obligations established in the sales transactions. In order to receive favorable tax treatment, the Limited Partners had to be liable for the debts of the Partnership, at least in the eyes of the IRS. Thus, all of the documents proclaimed that the Limited Partners were liable on the Partnership Note, the Partnership's primarily liability. On the other hand, the Limited Partners also wanted to minimize their risk. Therefore, they required that Sellers, the actual beneficiaries of the Note, relinquish their right to pursue the Limited Partners. Ironically, the IRS ultimately determined that the Limited Partners were not sufficiently at-risk to obtain maximum tax benefits, but many of them have settled with or been found liable to Western in deficiency actions.

("Partnership Security Agreement") and a certain wraparound note dated December 31, 1984."

## C. The Defaults and Foreclosure

Sellers expected to receive their first payment from World, based on the nursery's cash flow, in January 1986. World did not make a payment to Sellers, and argued that no payment was due under the cash-flow formula from which payments were to be calculated. On February 7, 1986, Sellers sent World a letter declaring World to be in default and purporting to accelerate World's obligations to Sellers.

On February 20, 1986, Sellers sent a second letter to both World and to the Limited Partnership, again declaring default and accelerating the notes. Specifically, Sellers alleged four events of default against the Limited Partnership. Sellers alleged that the Limited Partnership was in breach of its obligations under the Partnership Security Agreement, three of which were owed to World and one of which ran directly to Sellers.

Sellers incorporated their allegations of default into a lawsuit pending in the Arizona Superior Court for Maricopa County. The lawsuit involved multiple claims between the different Sellers and between the Sellers and World and the Limited Partnership. On May 8, 1986, Sellers moved for partial summary judgment against World and the Limited Partnership seeking foreclosure. On October 22, 1986, the Maricopa court entered judgment on Sellers' motion and against both World and the Limited Partnership. The court found that World and Limited Partnership were in default on their obligations to Sellers, entered a money judgment against World, and foreclosed on Sellers' security interest in all collateral held by World and the Limited Partnership. The Maricopa Court invited Sellers to apply for a special writ of execution so that the collateral could be sold at a sheriff's sale.

World and the Limited Partnership immediately filed a motion to stay the foreclosure sale, and then attempted to surrender the collateral to Sellers in order to avoid the sale. Sellers rejected this offer, and World and the Limited Partnership sought a second stay. After two hearings, the state court denied the request for a stay and ordered the collateral sold by the sheriff. World and the Limited Partnership then unsuccessfully sought a stay from the

1  Arizona Court of Appeals. The Maricopa County Sheriff conducted a sale on December 2,
2  1986. Sellers purchased the physical assets of the nurseries, and Western purchased the
3  Partnership Note for $677,000. In November, 1987, the Arizona Court of Appeals affirmed
4  the decisions of the trial court. The supreme court denied review.

**D.     Subsequent Litigation**

On December 3, 1986, Western filed a deficiency action against the Limited Partnership and the Limited Partners in Maricopa County Superior Court. In its Amended Complaint, Western alleged: "Defendants, Arizona World, Harvey Minars and the 201 limited partners have breached their agreement with the Sellers . . . and said Sellers were entitled to accelerate and did accelerate on February 20, 1986, November 14, 1986 and November 19, 1986, the [Partnership] Note attached hereto. . . ." The limited partners moved to dismiss the claims against them for lack of personal jurisdiction. The Maricopa court granted the motion to dismiss, and Western proceeded to obtain judgment against the Limited Partnership only, and not the Limited Partners.[4]

Since 1986, Western has pursued additional deficiency actions against many of the Limited Partners, with varying degrees of success. In litigation in New York, a group of the Limited Partners obtained a declaratory judgment preempting Western's claims. See Hauser v. Western Group Nurseries, Inc., 767 F. Supp. 475 (S.D.N.Y. 1991). The Limited Partners successfully argued that the clause in the Sellers' Security Agreement that barred Sellers from suing the Limited Partners on the Note also barred Western's deficiency action. See id. at 485-487. In Colorado, the courts reached the opposite conclusion, and Western obtained judgment against the Limited Partners. See Western Group Nurseries, Inc. v. Pomeranz, 867 P.2d 12 (Col. App. 1993). In Florida, a district court granted summary

---

[4] From the record before it, the Court cannot determine how the Maricopa court concluded that it lacked personal jurisdiction over the Limited Partners. Each of the Limited Partners invested no less than $32,000 to become members of a limited partnership formed under a partnership agreement governed by Arizona law, registered in Arizona, and with all of its assets in Arizona.

judgment against the Limited Partners. However, the Eleventh Circuit reversed, holding that the proper interpretation of the various contracts raised issues of fact. See <u>Western Group Nurseries, Inc. v. Ergas</u>, 167 F.3d 1354 (11th Cir. 1999).

### E. The Bankruptcy

Western filed for bankruptcy on March 12, 1992.[5] During the course of the bankruptcy, Western initiated at least four adversary proceedings against different groups of limited partners. The bankruptcy court conducted an evidentiary hearing in one of the adversaries to determine whether Western could proceed against the Limited Partners. After concluding that the liability of the limited partners on the Note was limited only as to Sellers but not as to Western, the bankruptcy court proceeded to recommend the entry of summary judgment against the limited partners in each of the adversaries. The bankruptcy court rejected a variety of defenses, including arguments based on the statute of limitations, collateral estoppel, and fraud.

Mr. Leemon was the Defendant in Adversary Number 94-813. Western had previously sued Mr. Leemon in Florida and in New York. In New York, Western filed a Motion for Summary Judgment in Lieu of Complaint, pursuant to a unique New York procedure, on December 19, 1991. The New York state court denied the motion for summary judgment on June 5, 1992, but gave Western twenty days to continue the action by filing a formal complaint. On June 9, 1992, Western removed the New York action from state court to the United States District Court for the Eastern District of New York. Western did not file a complaint in the New York action until January 26, 1994. On September 19, 1994, the New York court transferred the action to the United States Bankruptcy Court for the District of Arizona, where it became Adversary Number 94-813.

Because all of the adversary proceedings against the limited partners involved non-core issues, the bankruptcy court submitted proposed findings of fact and conclusions of law

---

[5]Western United Nurseries, Inc. also filed for bankruptcy in early 1992. The bankruptcy court jointly administered the two bankruptcies.

- 9 -

to this Court. In three of the four adversary proceedings, all of the parties then filed Objections to the rulings of the bankruptcy court.[6] Western, which would largely prevail under the findings and conclusions of the bankruptcy judge, objected only to the recommendations denying attorneys' fees and setting the applicable interest rate.

Mr. Leemon filed an extensive set of Objections to the following decisions of the bankruptcy court:

## STANDARD OF REVIEW

When a bankruptcy judge submits proposed findings of fact and conclusions of law to a district court on a non-core proceeding, the district court shall enter judgment "after considering the bankruptcy judge's proposed findings and conclusions and after reviewing de novo those matters to which any party has timely and specifically objected." 28 U.S.C. § 157.

Although the bankruptcy court did hold one evidentiary hearing, it otherwise resolved the adversary proceedings on Western's motions for summary judgment. The Court must grant summary judgment if the pleadings and supporting documents, viewed in the light most favorable to the nonmoving party, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). Substantive law determines which facts are material. See Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986). Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. See id.

A principal purpose of summary judgment is to isolate and dispose of factually unsupported claims. See Celotex, 477 U.S. at 323-24. Summary judgment is appropriate against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

---

[6]In the fourth action, adversary number 94-183 (MC 97-21-PHX-SMM), none of the parties filed objections. The Court therefore entered judgment on the recommendations of the bankruptcy judge.

- 10 -

See id. at 322. The moving party need not disprove matters on which the opponent has the burden of proof at trial. Id. at 317. The party opposing summary judgment "may not rest upon the mere allegations or denials of [the party's] pleadings, but . . . must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).

**DISCUSSION**

**1.   Statute of Limitations**

In response to Plaintiff's motion for reconsideration, Mr. Leemon argued that the statute of limitations applied to him as well. However, the action originally filed in New York in 1991 has been continuously pending before one court or another and was never dismissed (except once by the bankruptcy court in an order that was later vacated and therefore has no effect). Mr. Leemon never sought to have this action dismissed; therefore, the action is timely.

**2.   Objections 1 & 2**

Mr. Leemon argues that the bankruptcy court unfairly applied the results of an evidentiary hearing for the other adversaries to his case. However, the bankruptcy court repeatedly stated that it would not and did not do this. (See Order of Referral, ¶ 3; transcript of 6/18/96 at 8, transcript of 3/21/96 at 21-23). Moreover, Mr. Leemon has not provided any evidence to support his argument. Therefore, this Court reaffirms the statements made by the bankruptcy court, and holds that the results of the evidentiary hearing were not unfairly applied. Moreover, even if the bankruptcy court did improperly incorporate findings from the evidentiary hearing, it would not matter because the issue can be decided as a matter of law. The primary and ultimate purpose of contract interpretation under Arizona law is to effectuate the parties' intent. See Taylor v. State Farm Mut. Auto. Ins. Co., 854 P.2d 1134, 1138 (Ariz.1993) (in banc). "Interpretation of a contract is a question of law for the court where the terms of a contract are found to be plain and unambiguous." Chandler Med. Bldg. Partners v. Chandler Dental Group, 855 P.2d 787, 791 (Ariz.Ct.App.1993). In the present case, the Court interprets the language of the contract to be clear and unambiguous. Therefore, the findings from the evidentiary hearing become immaterial.

**3.     Objection 3, Collateral estoppel**

Due to the number of Courts involved in these actions, and the different decisions each of them have reached at one time or another, all of them have concluded that it would be unfair and inappropriate to apply the doctrine of collateral estoppel. Therefore, the Court agrees with this rationale and holds that collateral estoppel does not apply in this action as well.

**4.     Objection 4, effect of 9-504**

UCC 9-504 is a safe harbor provision that protects the purchaser of an asset, such as the note here, who purchases the asset at a foreclosure sale. Mr. Leemon argues that this provision does not apply here for three reasons. First, he argues that 9-504 refers only to the discharge of the "security interest" under which a sale of collateral has been made, and does not provide for the discharge of the Security Agreement itself. Second, he argues that UCC 9-504 expressly limits the discharge of a security interest to purchasers who "do not buy in collusion with the secured party." Mr. Leemon claims that Western and WUN were acting in collusion with each other and therefore the discharge of security interest would not apply. And finally, he argues that UCC 9-504(4) cannot apply to the December 2, 1986 sheriff's sale because the Partnership Note was not sold "by a secured party" as required by the statute.

The first and third reasons are based on strained readings of the statute, and the case quotes cited by Mr. Leemon are taken out of context. The second stated reason is trumped by UCC 9-507, which states that a judicially approved sale is by definition commercially reasonable, and a purchaser at such a sale takes all rights free and clear of any restrictions. The sale here was approved by the Arizona state courts, both at the trial and appellate levels. Therefore, the provisions under UCC 9-504 do apply to the present, and the purchaser of the note is protected under this safe harbor.

**5.     Objection 5, Effect of limitation on right to sue in security agreement.**

Although the Court may agree that Article 3 does not apply, there is no issue arising from the application of the limitation on the right to sue. The limitation is in the security

1 agreement. It is appended to a sentence that states that Sellers are secured parties with a
2 security interest and all of the rights of a secured party except the right to sue directly. The
3 limitation therefore has no existence apart from the security interest. It is only by virtue of
4 the security interest that Sellers would gain the right to sue, and so it is only in the context
5 of the security interest that the limitation has any meaning.

6 When the security interest was discharged in the judicially approved foreclosure sale,
7 the limitation ceased to have any meaning. By its own terms, it applied only to the Sellers
8 (secured party) in the context of the security interest. The reason for the provisions of article
9 9 on foreclosure sales, especially judicially approved foreclosures, is to maximize value by
10 allowing the purchaser to take free of such restrictions. Therefore, the Court overrules this
11 objection and holds that there is no issue arising from the application of the limitation on the
12 right to sue.

13 **Objection 6: Collusion and bad faith.**

14 Because, as set forth above, judicially approved sales are reasonable, Mr. Leemon
15 cannot reach the judgment of collusion and bad faith. Therefore, this objection is overruled.

16 **6.     Objection 7: More collateral estoppel.**

17 Mr. Leemon claims that he was not precluded by collateral estoppel from challenging
18 whether the sheriff's sale had been conducted pursuant to Article 9. Having already
19 determined that the bankruptcy court correctly determined that the safe harbor provisions of
20 UCC § 9-504 do apply here, the Court finds that Leemon's argument is moot.

21 **7.     Objection 8: Motion to Dismiss or Stay.**

22 Mr. Leemon argues that the bankruptcy court erred by refusing to stay or dismiss this
23 proceeding. However, the Court finds that Mr. Leemon has no convincing authority for why
24 the action should not have proceeded here. Mr. Leemon simply repeats the argument he
25 made to the bankruptcy court: that the "first to file rule" dictates dismissing or staying this
26 proceeding until the Florida case was completed. However, as Plaintiff/Debtor's represented
27 in their Response to Leemon's Objections to the Findings of Fact and Conclusions of Law,
28 the parallel proceeding in Florida was dismissed without prejudice. Moreover, the Court

1  agrees with the bankruptcy court's determination that the circumstances of this case merit an
2  exception to the "first to file rule."  As the Ninth Circuit has previously held, the first to file
3  rule is not a rigid rule to be applied mechanically. Church of Scientology v. United States
4  Dep't of Army, 611 F.2d 738, 750 (1979).  Rather, the rule is intended to promote judicial
5  efficiency and avoid "the embarrassment of conflicting judgments." Id. Here, the bankruptcy
6  court already dealt with nearly identical legal and factual issues in companion adversary
7  proceedings and the parallel proceeding in Florida was dismissed, thereby eliminating the
8  risk of conflicting judgments. Therefore, the Court affirms the bankruptcy court's finding
9  that this case serves as an exception to the first to file rule was correct and Leemon's
10 objection is overruled.

**8.     Objection 9: Pre-Judgment Interest Rate.**

Mr. Leemon argues that the federal pre-judgment interest rate, as opposed to the New York rate, applies to the monies owed to Western.  However, it is undisputed that the underlying claim in this adversary proceeding is based on state substantive law.  The Bankruptcy Court originally ruled that the federal pre-judgment interest rate applied, but then modified its order and determined that when a federal judgment is based upon a state law claim, the court must look to state law to determine the propriety of prejudgment interest. The Court agrees with the bankruptcy court's reasoning: since this matter was based upon state law, not federal law, state law should determine the propriety of prejudgment interest. Thus, Mr. Leemon's objection is overruled and the New York prejudgment interest rate applies.

**9.     Objection 10: Attorneys' fees.**

Western objects to the bankruptcy court's finding that attorneys' fees are not recoverable because New York law, rather than Arizona law, controls. Western asserts that Arizona law governs the attorneys' fees inquiry since the Partnership Agreement is the contract that established the limited partners' liability.

The Limited Partnership was formed pursuant to the laws of Arizona and was registered in Arizona.  The Partnership Agreement is governed by Arizona law.  The

- 14 -

remaining agreements involved in the underlying lawsuit were governed by New York law per the parties choice of law in the following agreements: 1) Subscription Agreement, 2) Purchase Agreement and 3) Security Agreement. The bankruptcy court determined that New York law applied to the action because the Partnership Agreement governed the relationship between the limited partners, but not between the limited partners and Western. The Court finds that it is unclear from the record which law should govern the attorneys' fees inquiry. As Western asserts, the Partnership Agreement is governed by Arizona law. Moreover, this is a contract action and Arizona has had significant contacts with the transactions at issue, which supports Western's contention that it is entitled to attorneys' fees. See Aries v. Palmer Johnson, Inc., 153 Ariz. 250, 735 P.2d 1373 (App. 1987). Therefore, the Court will sustain this objection and remand this case back to the bankruptcy court on the issue on attorneys' fees.

## CONCLUSION

Therefore, in light of the reasons set forth above, all of the objections to the bankruptcy court's findings, except Western's objection regarding the award of attorney's fees, are **OVERRULED** and **IT IS HEREBY ORDERED** adopting the the bankruptcy court's Proposed Findings of Fact and Conclusions of Law in Adversary Number 94-813 excepting only the bankruptcy court's findings of fact and conclusions of law regarding the award of attorneys' fees.

**IT IS FURTHER ORDERED** remanding this case back to the bankruptcy court for additional inquiry into whether Western is entitled to an award of attorneys' fees.

**IT IS FURTHER ORDERED** directing the Clerk of Court to forward a copy of this Order to Bankruptcy Judge George B. Neilsen, Jr.

DATED this 14th day of September, 2007.

_____
Stephen M. McNamee
United States District Judge